**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| **HEATHER WARREN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CASE NO. 2:26-cv-001** |
| **GARY PORTER SERVICES, INC.** | ) | |
| **d/b/a INDIAN OAKS CAMPGROUND,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **GARY PORTER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Heather Warren, by counsel, files her Complaint and Demand for Jury Trial against Defendants Gary Porter Services, Inc. d/b/a Indian Oaks Campground, and Gary Porter, for violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*.; violations of the Fair Housing Act ("FHA"), 42 U.S.C.A. § 3603 *et seq*.; and violations of the Indiana Fair Housing Act ("IFHA"), Ind. Code 22-9.5-1-1, *et seq*. Additionally, Plaintiff sues Defendants for Fraud under Indiana common law.

## I. Parties, Jurisdiction and Venue

1. Plaintiff Heather Warren ("Warren") is a citizen of the United States, and at all times relevant to this action has resided in Marion County, Indiana, within the geographic boundaries of the Southern District of Indiana.

2. At all times relevant to this action, Warren is, and has been, a qualified individual with a disability, as that term is used in the ADA.

3. Defendant Gary Porter Services, Inc. d/b/a Indian Oaks Campground ("GPS") is a domestic, for-profit corporation whose principal office is located in Owen County, Indiana, within the geographic boundaries of the Southern District of Indiana.

4. GPS owns and operates Indian Oaks Campground ("Campground"), which is located in Owen County, Indiana, within the geographic boundaries of the Southern District of Indiana.

5. The Campground leases campsites for recreational vehicles.

6. Defendant Gary Porter ("Porter") is a citizen of the United States, and at all times relevant to this action, has resided within the geographic boundaries of the Southern District of Indiana.

7. Porter is the President of GPS, and the manager of the Campground.

8. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 42 U.S.C. § 12117 (ADA); 42 U.S.C. § 3613 (FHA); and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

9. All events giving rise to this action occurred in Owen County, within the geographic boundaries of the Southern District of Indiana, making venue proper in this Court.

## II. <u>Factual Allegations</u>

### A. Warren "Buys" a Lot at Indian Oaks

10. Warren is a lesbian, who suffers from Dissociative Disorder and Social Anxiety Disorder.

11. Because of her disorders, Warren requires the assistance of a Psychiatric Service Dog ("PSD"). Her PSD is a miniature Yorkshire Terrier named Sully, who is also Warren's Emotional Support Animal ("ESA").

12. Porter and members of his immediate family run the Campground, which they market as a "family campground."

13. Warren learned about the Campground from neighbors and had been on the Campground's waiting list for approximately two years.

14. In 2022, Warren, who had just gotten out of the hospital, met with Porter at the Campground.

15. While showing Warren several campsites, Porter told her that he would "negotiate the sale of everything" if Warren decided to "buy" a campsites.

16. According to Porter, Warren would purchase the campsite, and would then pay a $2,000 yearly membership fee to have access to all of the Campground's amenities.

17. Warren paid Porter $8,500 for a lot, however Warren was not provided with a contract at the time.

18. Warren's lot had a rather shabby deck, a storage shed, and two small fishing docks on it. It also had a wooden "carport" which had covered the previous owner's trailer, but which had been removed to allow the camper to be moved out.

19. After mailing Porter a check, Warren returned to the Campground to sign the paperwork.

20. To her surprise, the paperwork was a ***lease***, rather than a contract to purchase the lot.

21. When she questioned Porter, he told her that she had "purchased" only the fixtures on the site, but that the site itself was leased.

22. The following summer, the Campground sent a letter to all residents saying that any site with a wooden carport would have to remove it and replace it with a new carport sold by Porter.

23. Warren objected that she had purchased the site with the intention of re-installing the wooden carport, and that Porter was now telling her she had to buy a new carport.

**B. Plaintiff Is Subjected to Harassment on the Basis of Her Sexual Orientation**

24. At the beginning of the summer in 2024, while Warren was having upgrades done to her campsite, her ex-wife of 30 years came to the Campground to assist Warren, as at that time Warren was subject to medical restrictions.

25. At about that time, Porter became aware of Warren's sexual orientation, and Warren noticed a change in Porter's attitude toward her, with Porter beginning to make frequent references that "this is a family campground."

26. Additionally, when Warren had two loads of gravel to improve her campsite, Porter told her that the Campground could not spread the gravel, as it had frequently done for other campsite owners/lessees.

27. While Porter maintained that the Campground's tractor "wouldn't fit," earlier that spring the Campground had used its tractor to assist in moving a dead tree from Warren's site.

28. Around mid-July 2024, Porter began to question Warren repeatedly about "this Beth person" (Warren's ex-wife).

29. When Warren asked shy Porter was questioning her about her ex-wife, Porter replied that someone named "Beth" had left an unfavorable review of the Campground.

30. Beth had left a one-star review stating that she didn't think it was right for Campground to refuse to spread the gravel Warren had posted.

31. At the time, Beth was unaware that Porter had attempted to evict Warren the previous year because Warren had left a one-star review based on the Campground's alleged "harassment" involving upgrades to her campsite.

32. In the same review, Warren also referred to the fact that Porter had originally told her she was purchasing the campsite, before later stating that Warren was only renting the site.

33. When Warren apologized and said she would remove the review, Porter relented, telling Warren that she should only post five-star reviews.

34. In the summer of 2025, Warren began having more visitors to her Campsite.

35. Many of these guests were visibly gay, "Butch" females.

36. At some of the Campground social events, Warren began to hear rumors from other campers that Porter "didn't like" Warren.

37. These same campers told Warren that Porter was telling campers that "things were going on" with Warren's visitors.

38. During this period, as Warren was driving her truck in the Campground, two boys began yelling comments to Warren from one of the campsites, repeatedly referring to her as a "dyke" and a "lesbian."

39. One off the boys exposed himself to Warren, shaking his penis at her and asking her "how do you like this, dyke?

40. Warren pulled into the campsite and saw Porter's son, wearing an Indian Oaks Staff shirt.

41. After determining that the site did, indeed, belong to Porter's son, and that the two boys were Porter's grandchildren, Warren described the incident to Porter's son, who responded by saying "Okay," and shutting the cabon door of the tractor he was driving in Warren's face.

**C. The Incident at the Beach**

42. The Campground allows pets, but they are prohibited from being on the beach.

43. As a PSD, Sully would accompany Warren to the beach.

44. Warren was always careful, when Sully was at the beach, never to allow Sully to relieve herself on the beach. Instead, Warren always took Sully into the woods, away from the beach.

45. One day in late July 2025, however, Warren and one of lesbian guests were at the beach, floating on separate rafts, with Sully floating on Warren's raft.

46. One of the Campground Staff, ultimately identified as Porter's wife, began screaming at Warren, telling her to "Get that dog out of there."

47. The staff member also told Warren that she needed "to read the fucking rules," because dogs were not allowed on the beach.

48. Warren attempted to explain both that Sully was a service animal (and thus permitted to accompany Warren to the beach), and that Sully had frequently accompanied her to the beach on other occasions.

49. However, Warren's explanations fell of deaf ears, and the staff member continued to insist that Warren take Sully and leave the beach.

50. Warren replied that the staffer should "zip it," and that she and her guest were coming as fast as they could.

51. As Warren was preparing to leave the beach, Porter arrived, and told Warren, "I'll put you out over shit like this. You're not going to talk like that to my wife."

52. Porter also told Warren that "This is a family campground, and we're not going to tolerate this."

53. At the time there were several other campers on the beach, all of whom heard the exchange.

54. Warren wrote a letter of apology to the Campground, pointing out that Sully was a PSD – a fact she had made known to the staff from the beginning – but received no response.

**D. Porter Refuses to Renew Warren's Lease and Interferes With Her Attempts to Sell**

55. In October 2025, at the time renewal notices are normally sent out for the campers to renew for the following year, Warren received a letter advising her that the Campground would not renew her lease for the following year because of the "incident on the beach."

56. After being told her lease would not be renewed, she placed "For Sale" signs on her site in order to recoup the money she had paid for the lot and fixtures.

57. Porter, however, told Warren that she could not place the "For Sale" signs. Porter told Warren that she could advertise the sale on line, but suggested that it would be better if he sold the fixtures for her.

58. Porter added that he would charge Warren a ten percent commission based on the selling price.

59. If Warren did not sell, however, Porter told her the alternative was to take everything from the lot and simply leave.

60. Porter visited Warren's site repeatedly during the next few days.

61. During one visit, while Warren was away from the campsite, Porter's visit was captured on Warren's security cameras. When Warren returned, she noticed that her folder, containing all of her documentation and communication about the campsite, was missing from her table.

62. Warren decided to post her site and fixtures on Facebook, which resulted in multiple inquiries from potential buyers.

63. One couple asked to see the site and expressed interest, eventually offering Warren $50,000 for the lot and fixtures.

64. Shortly thereafter, Porter called and informed Warren that the couple would have to go

through a background check and be approved before they could lease Warren's site.

65. Porter was very interested in the amount the couple had agreed to pay Warren.

66. Porter told Warren that he had already listed her lot and fixtures, even though Warren had not authorized him to do so.

67. Ultimately, Porter pressured Warren to sign a document promising to pay Porter ten percent of the sale price.

68. Ultimately, Warren removed her camper and other fixtures from the lot.

## III. Legal Allegations

### A. Federal Legal Allegations

### Count One: Disability Discrimination (ADA)

69. Plaintiff restates each and every allegation in the foregoing paragraphs as though fully set forth herein.

70. As a disabled individual, Plaintiff had a right under the ADA to be accompanied by Sully at all times while utilizing and enjoying the facilities of the Campground.

71. The Defendants' actions in denying Plaintiff the use of the beach while accompanied by Sully, subjected Plaintiff to discrimination on the basis of her disability, and therefore constitute a violation of the ADA.

72. Defendant acted intentionally, wilfully, and/or with deliberate indifference to Plaintiff's right under the ADA to be accompanied by Sully.

73. As a direct and proximate result of the Defendant's unlawful actions, Plaintiff suffered, and continues to suffer, damages, including but not limited to, financial loss, stress, anxiety, and emotional distress.

**Count Two: Failure to Accommodate (ADA)**

74. Plaintiff restates each and every allegation in the foregoing paragraphs as though fully set forth herein.

75. At all times relevant, Warren suffered, and continues to suffer, from mental impairments that require her to utilize the services of a PSD in order to utilize and enjoy the facilities of the Campground.

76. Plaintiff was entitled to be accompanied by her PSD while utilizing and enjoying the facilities and services of the Campground.

77. Defendants' actions denied Plaintiff a reasonable accommodation in violation of the ADA.

78. As a direct and proximate result of the Defendant's unlawful actions, Plaintiff suffered, and continues to suffer, damages, including but not limited to, financial loss, stress, anxiety, and emotional distress.

**Count Three: Disability Discrimination (FHA)**

79. Plaintiff restates each and every allegation in each of the foregoing paragraphs as though fully set forth herein.

80. Plaintiff uses her campsite as her summer residence, and therefore the Campground is a "dwelling" as that term is defined by the FHA.

81. Plaintiff's impairments constitute a "handicap" as that term is used in the FHA.

82. The Defendants' actions denied Plaintiff the full use and enjoyment of the Campground.

83. Plaintiff requires a reasonable accommodation, in the form of her PSD, to fully use and enjoy the Campground.

84. The Defendants' actions denied Plaintiff the full use and enjoyment of her dwelling, and therefore constitutes unlawful discrimination against Plaintiff because of her handicap.

85. The Defendants' actions were intentional, willful, and/or taken with reckless disregard for Mitchell's rights.

86. As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffered, and continues to suffer, damages, including but not limited to, loss of the free use and enjoyment of her dwelling, financial loss, emotional distress, humiliation, embarrassment, and legal expenses.

**Count Four: Sex Discrimination (FHA)**

87. Plaintiff restates each and every allegation in each of the foregoing paragraphs as though fully set forth herein.

88. The Defendants' actions discriminated against Plaintiff on the basis of her sexual orientation by denying her the full use and enjoyment of her dwelling, in violation of the FHA.

89. The Defendants' actions were intentional, willful, and/or taken with reckless disregard for Mitchell's rights.

90. As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffered, and continues to suffer, damages, including but not limited to, loss of the free use and enjoyment of her dwelling, financial loss, emotional distress, humiliation, embarrassment, and legal expenses.

**B. State Law Legal Allegations**

**Count Five: Violation of the IFHA (Ind. Code 22-9-9.5-2)**

91. Plaintiff restates each and every allegation in each of the foregoing paragraphs as though fully set forth herein.

92. Plaintiff is a "aggrieved person," as that term is defined in Ind. Code 22-9-9.5-2.

93. Plaintiff uses her campsite as her summer residence, and therefore the Campground is a "dwelling," as that term is defined in Ind. Code 22-9.5-5-8.

94. The Defendants' actions in denying Plaintiff the right to be accompanied by her ESA denied Plaintiff full use and enjoyment of her dwelling because of her disability.

95. The Defendants' actions were intentional, willful, and/or taken with reckless disregard for Plaintiff's rights.

96. As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffered, and continues to suffer, damages, including but not limited to, loss of the free use and enjoyment of her dwelling, financial loss, emotional distress, humiliation, embarrassment, and legal expenses.

**Count Six: Sex Discrimination (IFHA)**

97. Plaintiff restates each and every allegation in each of the foregoing paragraphs as though fully set forth herein.

98. The Defendants' actions discriminated against Plaintiff on the basis of her sexual orientation by denying her the full use and enjoyment of her dwelling, in violation of the IFHA.

99. The Defendants' actions were intentional, willful, and/or taken with reckless disregard for Mitchell's rights.

100. As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffered, and continues to suffer, damages, including but not limited to, loss of the free use and enjoyment of her dwelling, financial loss, emotional distress, humiliation, embarrassment, and legal expenses.

**Count Seven: Fraud**

101. Plaintiff restates each and every allegation in each of the foregoing paragraphs as though fully set forth herein.

102. Porter told Warren that he would "negotiate the sale of everything" if Warren decided to "buy" a campsite.

103. Porter also told Warren she would "purchase" the campsite, and would then pay a $2,000 yearly membership fee to have access to all of the Campground's amenities.

104. Porter's statements constituted material misrepresentations of existing facts.

105. Porter's statements were false.

106. Porter knew his statements were false and/or acted with reckless disregard for the truth of the statements.

107. By making the false and misleading statements, Porter intended to deceive Warren.

108. Warren reasonably and justifiably relied on Porter's misrepresentations.

109. Porter's misrepresentations were the direct and proximate cause of damages to Warren.

## IV. Relief Requested

WHEREFORE, Plaintiff Heather Warren, by counsel, asks the Court to return a verdict in her favor, and against the Defendants, on all counts, and to provide the Plaintiff with the following relief:

110. Order the Defendants, jointly and severally, to pay Plaintiff her actual damages;

111. Order the Defendants, jointly and severally, to pay Plaintiff compensatory damages for the emotional distress, humiliation, and embarrassment caused by Defendants' actions;

112. Order the Defendants, jointly and severally, to pay Plaintiff punitive damages for their wilful, reckless and malicious actions;

113. Order the Defendants, jointly and severally, to pay Plaintiff pre- and post-judgment interest on all sums awarded;

114. Order the Defendants, jointly and severally, to pay Plaintiff's reasonable attorney fees and costs of litigating this action.

115. Order the Defendants, jointly and severally, to provide any and all other relief to which the

Plaintiff may be entitled.

## V. Demand for Jury Trial

Plaintiff Heather Warren, by counsel, demands a trial by jury on all issues so triable.

Respectfully submitted,

*s/ Jay Meisenhelder*

Jay Meisenhelder, Atty No. 19996-49
JAY MEISENHELDER EMPLOYMENT
& CIVIL RIGHTS LEGAL SERVICES, P.C.
650 North Girls School Road, Suite D40
Indianapolis, IN 46214
Office Telephone: 317/231-5193
Direct Telephone: 317/899-9220
Facsimile Number: 317/982-5463
Email Address: jaym@ecrls.com